## ROBINSON v. COPELAND.

---

PATENTS; INTERFERENCE; DILIGENCE.

1. A junior applicant in an interference case, who has against him three concurrent decisions of the tribunals of the Patent Office, must, in order to prevail in this court, establish his case beyond a reasonable doubt.
2. An award of priority of invention in an interference case will not be made to a party whose own testimony is uncorroborated.
3. That no one could be found who was qualified to construct the device and willing to do the actual work, is no excuse for inactivity for over eighteen months to reduce to practice, during which time a rival inventor conceived the invention and constructively reduced to practice, where it appears that the first inventor could have constructively reduced to practice by filing his application,—especially where it appears that he filed several applications in the Patent Office for improvements in the art during that time. Nor is the fact that the inventor was a very busy man in other directions an excuse.

No. 247.   Patent Appeals.   Submitted May 10, 1904.   Decided June 7, 1904.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                          *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Howard L. Osgood* and *Mr. C. S. Davis* for the appellant.

*Mr. J. S. Barker* and *Mr. Melville Church* for the appellee.

Mr. Justice MORRIS delivered the opinion of the Court:

This is an appeal from a decision of the Commissioner of Patents in an interference case, wherein the matter in controversy is the right of priority of invention of an improvement in brakes for bicycles and other vehicles, described in sixteen several counts, as follows:

"1. A coasting hub consisting essentially of a supporting shaft, a driving or gear sleeve rotatably supported, at a plurality of points thereon, an outer or wheel hub rotatably mounted on said gear sleeve and provided with a brake drum, means co-operating with said brake drum to apply a brake thereto, and means for automatically clutching together said gear sleeve and outer hub for driving the wheel and unclutching the same for coasting.

"2. A coasting hub consisting essentially of a supporting shaft, a driving or gear sleeve rotatably supported at a plurality of points thereon, an outer or wheel hub rotatably supported on said gear sleeve and provided at one end with a brake drum, means co-operating with said brake drum to control the speed of the wheel and means for automatically clutching together said gear sleeve and outer hub for driving the wheel and unclutching the same for coasting.

"3. A coasting hub consisting essentially of a supporting shaft, a driving or gear wheel rotatably supported at a plurality of locations thereon and provided at one end with a driver, an outer or wheel hub rotatably mounted on said gear sleeve, and provided with a brake drum located at the opposite end of the hub from the driver, means for applying a brake to said drum and means for automatically clutching together and unclutching said gear sleeve and outer hub.

"4. A coasting hub consisting essentially of a supporting shaft, a driving gear sleeve rotatably mounted thereon and provided at one end with a driver, an outer or wheel hub rotatably mounted on said gear sleeve and provided with a brake drum located at

the opposite end of the hub from the driver, a clutch pawl located outside of said gear sleeve and in suitable relation to said brake drum to co-operate therewith in braking, and means for automatically clutching together and unclutching said gear sleeve and outer hub.

"5. A coasting hub consisting essentially of a supporting shaft, a driving or gear sleeve rotatably mounted thereon, and provided at one end with a driver, an outer or wheel hub bearing rotatably on said gear sleeve and provided with a brake drum located at the opposite end of the hub from the driver, a clutch pawl located outside of said gear sleeve and within the lines of said brake drum and in suitable relation thereto to co-operate therewith in braking, and means for automatically clutching together and unclutching said gear sleeve and outer hub.

"6 A coasting hub consisting essentially of a supporting shaft, a driving or gear wheel rotatably mounted thereon and provided at one end with a driver, an outer or wheel hub wholly supported rotatably on said gear sleeve and provided with a brake drum located at the opposite end of the hub from the driver, means for applying a brake to said drum and means for automatically clutching together and unclutching said gear sleeve and outer hub.

"7. A coasting hub consisting essentially of a supporting shaft, a driving or gear sleeve mounted rotatably thereon and provided at one end with a driver, an outer or wheel hub wholly supported rotatably on said gear sleeve and provided with a brake drum located at the opposite end of the hub from the driver, a clutch pawl located outside of said gear sleeve and in suitable relation to said brake drum to co-operate therewith in braking, and means for automatically clutching together and unclutching said gear sleeve and outer hub.

"8. A coasting and braking hub consisting essentially of a supporting shaft, a driving or gear wheel mounted rotatably thereon, an outer or wheel hub wholly supported rotatably on said gear sleeve, and means for automatically clutching together and unclutching said gear sleeve and outer hub, a driving sprocket or gear secured to one end of said gear sleeve, a brake

arranged at the opposite end of said hub, and means for operating said brake by the backward rotation of the crank shaft.

"9. A coasting and braking hub consisting essentially of a supporting shaft, a driving gear sleeve supported rotatably at a plurality of locations thereon, an outer or wheel hub supported rotatably on said gear sleeve, and means for automatically clutching together and unclutching said gear sleeve and outer hub, a 'driving sprocket or gear secured to one of said gear sleeves, a brake arranged at the opposite end of said hub, and means for operating said brake by the backward rotation of the crank shaft.

"10. In a bicycle hub the combination with a driving sleeve and a driven sleeve provided with a braking drum, both sleeves extending practically from one end to the other of the hub, of means for applying a brake to said drum and a clutch which connects the driven sleeve with the driving sleeve when the latter is moved forward and disconnects said sleeves when the driving wheel is held stationary or moved backward.

"11. In a device of the character described, the combination with inner and outer continuous sleeves, the latter provided with a braking drum, of means for driving the inner sleeve, independent ball bearings for each end of said sleeve, a clutch between the two sleeves, and means for applying a brake to said braking drum.

"12. In a cycle, the combination with the rear shaft, of a wheel having its hub comprising two independent continuous sleeves extending from end to end of said hub, the outer sleeve being provided with a braking drum and having connections for the spokes and the inner sleeve having means at one end whereby it may be rotated, a clutch intermediate said sleeves, and means for applying a brake to a braking drum.

"13. In a cycle, the combination with the rear axle, of an inner sleeve adapted to rotate thereon and to which power is applied, an outer sleeve provided with a braking drum and having spoke connections, both of said sleeves being continuous from end to end of the hub, independent bearings for said sleeves, a clutch intermediate said sleeves, and means for applying a brake to said braking drum.

"14. The combination with a wheel hub, of a brake mechanism located at one end of the hub and a driver located at the opposite end of said hub, a sleeve connected with the driver and projected within the hub and arranged to bear at more than one point on the supporting shaft, and clutch devices for connecting the driver and sleeve with the hub for driving the wheel, or with the brake mechanism to apply the brake.

"15. In a bicycle, the combination with a supporting axle and a wheel hub, of a driver provided with a connected sleeve mounted upon the axle and projected within the hub, said sleeve being supported at a plurality of locations on said supporting axle, a brake mechanism comprising a brake actuator, and clutch devices for connecting the driver sleeve with the hub or the brake actuator.

"16. In a bicycle, the combination with a supporting axle and a wheel hub, of a driver located at one end of the hub, and a brake mechanism located at the opposite end of the hub, a sleeve connected to the driver and projected laterally within the hub, said sleeve bearing at a plurality of points on said supporting axle, and a clutch connection between the said sleeve and the brake mechanism."

These sixteen several counts have been divided by the Examiner of Interferences in the Patent Office into two groups,—one of which, comprising the ten counts numbered 1, 2, 3, 6, 8, 9, 10, 11, 12, and 13, calls for a double-sleeve construction as applied to the rear hub, without mention of any means for connecting the inner sleeve with the brake mechanism,—the other, comprising the six counts numbered 4, 5, 7, 14, 15, and 16, describes such connecting means; and this classification has been adopted by the Board of Examiners-in-Chief and by the Commissioner of Patents. It is important in view of the fact that, as found by the several tribunals of the office, the several conceptions involved in the several groups were not originated at the same time by the appellant in this case, while as to the appellee the distinction is not very important.

Both of the parties appear to be inventors and patentees in matters of bicycle mechanism. The appellee, Copeland, is the

senior applicant for the present invention; he came into the Patent Office with his application on April 29, 1898. The appellant, Robinson, did not file his application until June 25, 1901, or more than three years after his competitor. But this application was only a division of an application filed on September 18, 1899, which, therefore, for the purpose of this interference is to be regarded as Robinson's filing day. He also seeks to connect his present application with two previous applications of October 8, 1897, and November 15, 1897, respectively.

Robinson, in his preliminary statement, claims to have conceived the invention in question on or about October 21, 1897; to have disclosed it about the same time; and to have reduced it to practice by the construction of a full-sized operative machine in November and December of 1899. In this statement he somewhat confuses the matter by an allegation of drawings made before the date assigned by him as that of his actual conception, and by the statement that his ideas were embodied in a complete bicycle between October 8, 1897, and December 8, 1897. This statement is inconsistent and misleading, and should not have been made without some explanation.

Copeland, in his preliminary statement, alleged conception of the invention on or about December 23, 1897; disclosure of it on December 29, 1897, and January 17, 1898; and the completion of a full-sized machine embodying the invention on February 15, 1898.

The Examiner of Interferences and the Board of Examiners-in-Chief left in considerable doubt the matter of Robinson's conception of the invention on October 21 of 1897; but the Commissioner of Patents held that he had sufficiently established that date for himself, as to the first group of counts before mentioned, but that he had not shown any conception of the second group before Copeland's filing date of April 29, 1898. All the tribunals of the Patent Office, however, held that, even if Robinson conceived the invention in October of 1897, he did nothing thereafter toward its reduction to practice until November or December of 1899, about a year and a half after its constructive reduction to practice by Copeland; and that he was therefore

chargeable with want of diligence; and they awarded judgment of priority of invention to Copeland. From the Commissioner's award Robinson has appealed to this court.

The appellant has upon him the double burden of being the junior applicant and of having against him the three concurrent judgments of the tribunals of the Patent Office: and we have held that under such circumstances he should, if he would prevail, establish his case in this court beyond a reasonable doubt. We do not think that he has done so; and we see no reason for reaching a different conclusion from that reached by the Commissioner of Patents and the other tribunals of his office.

That the appellant was the first to conceive the invention, may well be assumed, although the testimony on the subject is far from being as clear as it should be. The testimony of the appellant himself is ample for the purpose; but, under the rules of evidence which must govern in such cases, corroboration is essential. The corroboration here is the testimony of one witness, which is somewhat wanting in definiteness. Still we think, as the Commissioner of Patents has thought, that it is sufficient for the purpose; and therefore it need not be discussed in detail. The weakness of the appellant's case lies in the fact that, after having conceived the invention, as we may assume that he did conceive, he put it aside and remained wholly inactive in regard to it for upward of eighteen months; and in the meantime the appellee, Copeland, conceived the invention, and constructively reduced it to practice by filing his application in the Patent Office.

Robinson, it is true, makes some attempt to excuse his inactivity. He claims that he could find no one who was equipped to construct the requisite parts of the device and willing to do the actual work. But the plain answer to this is that he could have obtained a constructive reduction to practice by filing his application in the Patent Office; and the very fact of his inability to get anyone to do the work for him would have dictated the propriety of diligence in making such an application. He made four or five applications to the Patent Office during the interval when this invention was held in abeyance; and these applica-

tions were all for improvements in this same art. It is not apparent why he could not also have made an application for this invention at the same time. He also claims to have been, and no doubt he was, a very busy man in other directions; but it is well-settled law that this is no sufficient excuse for inactivity which allows the intervention of others in the field of invention and the perfection of their enterprises. And, if he was not too busy to make the other applications that have been mentioned, we do not see why he should have been too busy to make the application for this present invention. We are of opinion that the Commissioner of Patents and the other tribunals of the Patent Office were right in holding that there was not due diligence on the ·part of Robinson.

It follows that the decision of the Commissioner of Patents, awarding judgment of priority of invention to Copeland, should be affirmed.

The clerk of the court will certify this opinion and the proceedings of this court in the premises to the Commissioner of Patents according to law.                          *Affirmed.* ˈ